# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| LINDA S. MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:10CV00159 AGF |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action is before the Court for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Linda Miller was not disabled and,

thus, not entitled to disability insurance benefits under Title II of the Social Security Act,

42 U.S.C. §§ 401-434, or Supplemental Security Income under Title XVI of the Act, *id.*

§§ 1381-1383f. For the reasons set forth below, the decision of the Commissioner shall

be affirmed.

Plaintiff, who was born on September 19, 1964, filed her applications for benefits

on December 4, 2007, at the age of 43, alleging an initial disability onset date of March

29, 2007, due to Hepatitis C, back pain, migraines, foot problems and digestive problems.

Plaintiff subsequently amended her disability onset date to November 3, 2007, because

she worked until that date. After Plaintiff's applications were denied at the initial

administrative level, Plaintiff requested a hearing before an Administrative Law Judge

("ALJ") and such a hearing was held on November 30, 2009.  By decision dated March

18, 2010, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to

perform sedentary work, and therefore was not disabled under the Act.  Plaintiff's request

for review by the Appeals Council of the Social Security Administration was denied on

September 7, 2010.  Plaintiff has thus exhausted all administrative remedies and the

ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in

the record as a whole.  Specifically, Plaintiff argues that the ALJ's finding that Plaintiff

did not have a combination of impairments that met the requirements of a "deemed

disabling impairment" as listed in the Commissioner's regulations, is not supported by the

evidence.  In addition, Plaintiff asserts that the ALJ improperly assessed her RFC.

Plaintiff asks that the ALJ's decision be reversed and the case remanded to the

Commissioner for reconsideration.

## BACKGROUND

### Work History and Application Forms

The record indicates that Plaintiff worked from 1992 to 2007 at various jobs, both

full and part time; including as a cashier, warehouse worker, school bus driver, baker,

clerk/secretary, floral delivery person, security guard, and dispatcher; earning $6.00 -

$10.00 per hour.  Plaintiff most recently worked part time as a housekeeper, earning

$6.50 per hour (Tr. 212).

In the Function Report section of her application for benefits, Plaintiff stated that

she lived at home by herself and described her daily activities as getting up and sitting with her grandmother so her mother could go places. She wrote that she spent most of her time during the day watching television and that she was in constant pain and had difficulty breathing, which precluded her from working. She described her symptoms as "constant pain, trouble breathing, Hep. C" and "cannot stand more than 60 minutes or feet start to hurt and bleed. Cannot lift, have limited range of motion."

Plaintiff also stated that bending, lifting, and working with the public made her symptoms worse. She indicated that she cared for her 95 year-old grandmother by helping her dress, cook, and walk to the bathroom. She was able to pay bills, use a checkbook, complete a money order, count change, do laundry and dishes, make the bed, iron, vacuum/sweep, take out trash, mow lawn, bank, and go to the post office, but was unable to do home repairs, car maintenance, rake leaves, or garden. She went shopping about once every two weeks for about 15 minutes at a time, and was able to prepare full meals.

Plaintiff further wrote that due to her breathing difficulties she was unable to lay down flat and had to sleep in a recliner. Plaintiff indicated that she read books, newspapers, and magazines, had a driver's license, and drove about once every two weeks to go to doctor's appointments and grocery shopping. She also stated that she was "shut out of the work place" once people found out about her condition, and that she had no friends. (Tr. 230-37.)

In the Disability Appeal form, Plaintiff listed the medications she was taking at

the time:  Amitriptyline for sleep, Gabapentin for neuropathy, and Hydrocodone with APAP, as well as ibuprofen for pain.  (Tr. 245.)

**Medical Record**

Plaintiff was admitted to a psychiatric unit on May 29, 2006, following an overdose of Tylenol after her boyfriend threatened to leave her.  (Tr. 283-90).  She was discharged in stable condition on June 2, 2006 (Tr. 284), with diagnoses of mood disorder and borderline personality disorder.  (Tr. 283).  Plaintiff refused further psychiatric treatment at that time, despite a history of prior psychiatric hospitalizations, sexual abuse, and suicide attempts.  On July 19, 2006, Talia Haiderzad, M.D., performed a psychiatric examination of Plaintiff, finding her concentration and attention fair and her insight and judgment fair to borderline.  (Tr. 299-302 ).  Dr. Haiderzad diagnosed mood disorder (Tr. 301), prescribed medications, and recommended follow up in five or six weeks.  (Tr. 301-02).  Following a February 7, 2007 visit with Dr. Haiderzad at which Plaintiff's mental status was determined to be within normal limits, Plaintiff did not return to see her.  Thereafter, her primary care physician, Prem Varma, M.D., intermittently prescribed antidepressant medication for her. (Tr. 296).

On January 3, 2007, Charles Lavalle, M.D., examined Plaintiff.  (Tr. 464-66).  Besides Plaintiff's weight and some mild epigastric tenderness, Plaintiff's examination was unremarkable.   Dr. Lavalle scheduled Plaintiff for a liver biopsy (Tr. 465) which showed mild inflammation and mild fibrosis.  Dr. Lavalle recommended no treatment for the hepatitis based on Plaintiff's mild degree of disease, her other medical problems, and

her psychiatric history. He recommended a repeat biopsy in January 2010. (Tr. 465-68).

Plaintiff was treated at a local clinic for several acute illnesses, including bronchitis and a skin rash. She also received treatment for recurring episodes of hip and back pain, Hepatitis C, and depression. (Tr. 388, 392, 397, 401, 405-06, 521-22, 525, 530, 534, 539, 546). Hip x-rays performed on August 30, 2007, showed normal alignment with multiple calcifications in the pelvis, probably from phleboliths. (Tr. 390). X-rays of the lumbar spine showed some disk space narrowing and mild changes likely due to degenerative changes (Tr. 394). An MRI of the lumbar spine performed on November 2, 2007, showed a modest disc bulge at L5-S1 with moderate stenosis and mildly narrowed foramen. (Tr. 408).

On November 3, 2007, Plaintiff reported to the emergency room after being involved in a car accident. Hospital staff noted that Plaintiff was obviously intoxicated, had abrasions, soft tissue swelling, tenderness to palpation, chest wall tenderness, an anxious mood, and full range of motion in the neck. Plaintiff was diagnosed with a concussion, contusions, and abrasions. X-rays and a CT scan of Plaintiff's head showed no injury. (Tr. 380-85). X-rays of Plaintiff's rib cage, performed on November 19, 2007, showed numerous rib fractures. (Tr. 413).

Thomas Satterly, Jr., D.O., treated Plaintiff for low back pain, leg pain, foot numbness, gastroesophageal reflux disease, and Hepatitis C during 2008. (Tr. 423, 451, 454, 457). An x-ray of Plaintiff's lumbar spine performed on January 15, 2008, showed degenerative changes with no evidence of acute injury. (Tr. 769). A May 2008 MRI of

the lumbar spine showed degenerative disc changes and an old compression fracture. (Tr. 459).

Plaintiff started treatment for low back pain at the Advanced Pain Center on October 2, 2008. She was diagnosed with lumbar and cervical spondylosis following a motor vehicle accident. Two weeks later, on October 17, 2008, Plaintiff was noted to have mild tenderness and muscle spasm in the cervical spine, mild tenderness and trigger point in the lumbar spine, and normal range of motion and muscle strength in her lower extremities. Treatment continued through August 28, 2009. (Tr. 871-946).

In November 2008, Plaintiff started treatment for her Hepatitis C infection (Tr. 580). Dr. Lavalle noted that Plaintiff tolerated the treatment relatively well with the exception of some anemia. (Tr. 553, 559, 564, 569, 576, 737).

During 2009, Plaintiff continued to receive treatment at the clinic for Hepatitis C, hypercholesterolemia, and anemia as well as acute illnesses. (Tr. 614, 626, 651-52, 687, 716, 733,741, 748, 754, 760). Plaintiff underwent epidural steroid injections in March of 2009 for cervical spine pain at the pain center. (Tr. 916). In April of 2009, Plaintiff reported that the injections helped her cervical spine pain. (Tr. 913). She underwent another injection on April 21, 2009. (Tr. 909).

On June 8, 2009, Plaintiff reported to the emergency room after stepping in a hole while walking her dog. X-rays of her right shoulder and right ankle were unremarkable. (Tr. 786-87). Two days later, Plaintiff was admitted to the hospital with complaints of back pain, leg weakness, hypothyroidism, and depression. X-rays of her lumbar spine

showed mild compression along the superior end plate of the vertebral body. An MRI of the lumbar spine showed disc herniations at levels L4-5 and L5-S1. An MRI of the thoracic spine showed an old compression fracture of the T12 vertebral body and a hemangioma within the T3 vertebral body. Upon examination, the consulting doctor questioned Plaintiff's claims of leg weakness and noted that Plaintiff ambulated around the bathroom without any difficulty. Plaintiff was diagnosed with back pain, anemia, and hypothyroidism and discharged the next day. (Tr. 690-95, 809). On June 17, 2009, Plaintiff had a lumbar epidural injection at the pain center. (Tr. 896).

On July 7, 2009, Rylan Brantl, M.D., examined Plaintiff and noted that she gave inconsistent accounts as to how her back pain began. He also reported that Plaintiff's statements during the examination led him to question the validity of her responses and noted that Plaintiff exhibited several inconsistencies in her motor and sensation examinations. Plaintiff dragged her foot while walking during the examination, but walked with a normal gait in the hallway after the examination. Dr. Brantl stated that Plaintiff had an examination history of "questionable integrity" and noted that Plaintiff had no focal neurological abnormalities or focal deficits. Dr. Brantl further stated that there was evidence of mild to moderate disc herniations with no correlating physical examination findings. He opined that neurosurgical intervention was not warranted and recommended that Plaintiff follow up with her primary care physician. Dr. Brantl also recommended that Plaintiff obtain psychiatric care, undergo physical therapy, and be more active. (Tr. 674-77).

An upper GI examination, performed in August of 2009, showed moderate gastroesophageal reflux.  (Tr. 662).  Plaintiff reported to the emergency room on September 16, 2009, with nausea and abdominal pain.  The examination showed no respiratory distress, normal heart rate, normal joint range of motion, and a normal psychological affect.  Plaintiff improved with medication and fluids and was discharged home.  (Tr. 827-28).

**Evidentiary Hearing of November 30, 2009** (Tr. 26-71)

Plaintiff, who was represented by counsel, testified that she was 45 years old, 5' 6" tall, weighed 243 pounds, was divorced and had a 28 year-old son.  She lived in a one-story house and had a driver's license, but had not driven since October 31, 2008.  She had served in the United States Marine Corps for 18 months before she was unsatisfactorily discharged.

Plaintiff testified that she had a high school education and was not currently working.  She stated that she worked for a healthcare service company until an accident on November 3, 2007, when she was "run off the road by a drunk driver" and broke eight ribs and her nose, and suffered a concussion and spinal cord damage from her neck to her lower back.  Plaintiff stated that since the accident, she had tried to clean houses for people from her church, and had helped her mother take care of her elderly grandmother.  Her duties in taking care of her grandmother included making sure she did not wander off, assisting her in using the restroom, and helping her get up and move around.  Plaintiff often had to lift her grandmother, who weighed 110 pounds.  After her accident, it took

Plaintiff four months to recuperate before she could return to caring for her grandmother. At that same time, she tried to clean houses, but hurt her back after picking up her grandmother when she fell out of a chair.

Plaintiff testified that she had not submitted any applications for work recently because "[t]here's nothing in the paper." She then reviewed the rest of her work history. She stated that her ex-husband caused her to lose a lot of jobs because he would show up at her work drunk and start fights, and would constantly call her at work, which was not allowed.

Plaintiff stated that generally, she woke up between 6:00 and 8:00 in the morning, would let her dog out, take her medication, and often would go back to bed. She would stay in bed until 1:00 in the afternoon, and then get up and fix herself something to eat and walk her dog around her house. She often picked up the trash and watched a lot of movies. Plaintiff testified that she sometimes reads books, but she cannot concentrate, so she will end up reading the same page over and over again. She stated that she had one good friend with whom she kept in contact by telephone, but she did not have a good relationship with her son.

Plaintiff testified that she did her own laundry, made her bed, and went grocery shopping with the help of her mother. She stated that she no longer had hobbies because she could not do them anymore. Plaintiff smoked about three packs of cigarettes per week, but did not drink or do any drugs.

Plaintiff explained that she stopped being able to pay her own bills and take care

of her finances after she was not able to clean houses anymore.  When she was taking care of her grandmother, she was paid $20 per week.  Plaintiff testified that in June 2007, she was able to make her bed, change the sheets, vacuum, sweep, take out the trash, mow the lawn, go to the bank and post office, go shopping, and read books, magazines, and newspapers, but stopped being able to do that when she "almost died."

The ALJ asked Plaintiff about the inconsistencies in the symptoms she reported to Dr. Brantl in July of 2009 at the hospital.  She stated that the confusion arose because her symptoms resulted from two different incidents, an automobile accident and a fall.  She did not remember being uncooperative with treatments in 2006.  Plaintiff stated that she was currently taking Doxycycline, Prilosec, Phenegran, Xanax, Synthroid, Zanaflex, Hydrocodone, Ambien, Gabapentin, Lomotil, and Paxil.  She testified that she had stress seizures, caused by the stress of not being able to do things, and sometimes lost control of her bodily functions.  Plaintiff stated that when the seizures occur, she "zones out" for as long as an hour.

Plaintiff testified that as a result of the automobile accident, she had eight broken ribs, four that were discovered in the hospital, and four that were discovered a month later.  She stated that she had bulging discs in her L4/L5 and still saw a pain management doctor for cortisone shots in her neck and lower back.  Plaintiff testified that the cortisone shots helped for a day or two, and described her back pain as anywhere from seven to 10.
 She stated that she got Hepatitis C from a bad tattoo, and that her "viral load" had "disappeared" as a result of Interferon treatment, but her liver enzymes were still high.

Plaintiff further testified that she had problems with migraine headaches. She testified that in the prior week, she had a migraine for four straight days, and that Hydrocodone did not help with the pain. She stated that her hands and feet felt numb, and she could not feel if she damaged them, or stepped on something hot or sharp. She was not able to make a fist, but could zip and button her clothes, feed herself, comb her hair, and put on her shoes and socks. She testified that the side effects from her medicines included drowsiness, dry mouth, and inability to concentrate.

Plaintiff stated that she was first diagnosed with depression and anxiety in 2001, and it caused her to cry nightly and have anxiety attacks. She testified that her anxiety attacks have lessened since her divorce, and that Xanax stopped them during the day, but it did not stop them during the night. Plaintiff stated that she had been put in a mental hospital in 2004 or 2005 after attempting suicide by taking 83 pills. She testified that she had tried to kill herself nine times in the past, by slitting her wrists and over-medicating. She stopped psychiatric care so that she could get on Hepatitis C medication, and she had not had time to reschedule additional psychiatric care since completing the Hepatitis C medication. She testified that she had not talked to a psychiatrist since October 2007, and felt manic at times.

Plaintiff testified that she was able to sit, but it caused her pain. She could stand for about 15 minutes at a time, and walk about a half acre with the use of her cane. Plaintiff explained that she bought herself the cane because she got dizzy at times. She stated that she could lift about 10 pounds, and could not get back up from bending,

stooping, crouching, kneeling, or crawling without somebody coming and helping her. Plaintiff also testified that she was "wobbly" when it came to steps.

Plaintiff stated that she had recently lost 40 pounds as a result of Interferon treatments and being too sick to eat. She testified that the treatment lasted 48 weeks, during which time her anxiety was much higher and she could not "tolerate things as well," but her doctors discouraged her from seeing a psychiatrist because she could not see one and take the Hepatitis C medication at the same time.

Plaintiff testified that she did not have any source of income and that she was supposed to pay her mother $150 per month in rent. She stated that her mother was on Medicare, but made too much money to qualify under Medicaid. Plaintiff explained that she did not keep her house clean, but was able to change the sheets on her bed once every two weeks. There were days when she could never "make it up and around" and this occurred about four times per month. On the days when she had migraines, she testified that she had to lie down for four to five hours due to exhaustion.

The Vocational Expert ("VE") then testified, clarifying portions of Plaintiff's job history, in terms of skill level, exertional level, title, and DOT numbers. The ALJ then asked the VE to consider an individual of Plaintiff's age, education, and work experience, who was capable of performing the exertional demands of sedentary work; could carry ten pounds occasionally and less than ten pounds frequently; sit for six out of eight hours and stand and walk for two out of eight hours in a workday; was limited to simple repetitive tasks and instructions and occasional interaction with people; could

occasionally climb, balance, stoop, crouch, kneel or crawl; and could not be exposed to ladders, ropes, scaffolds, moving machinery, or unprotected heights.  The VE testified that such an individual could perform semi-skilled jobs, such as an addresser, a systems monitor, or a "sticker," and that such jobs existed in significant numbers in the local and national economies.  Plaintiff's counsel then asked the VE to consider the above hypothetical, but to posit that the individual was unable to maintain attention and concentration or to meet normal attendance, punctuality, or production requirements due to pain for four days a month.  The VE opined that such an individual would be precluded from competitive employment.

The ALJ concluded the hearing by noting that Plaintiff had not received psychiatric care for "some time" and ordered a psychiatric consultative examination. Additionally, because there were conflicts in the function report with regards to her physical abilities, the ALJ also ordered an orthopedic examination.

**Post-Hearing Medical Evidence  (Tr. 845-68)**

On January 11, 2010, pursuant to the ALJ's request for a psychiatric consultation, John Wood, Psy.D., examined Plaintiff and completed a Medical Source Statement.  Dr. Wood noted that Plaintiff was a "somewhat questionable historian."  He found Plaintiff cooperative and agreeable.  Plaintiff had a score of 29 out of 30 on the Folstein Mini Mental Exam where a score of 23 or below indicated a need for further assessment.  Dr. Wood also found that Plaintiff was oriented to time and place, spoke clearly and discernable and failed to exhibit delusions or hallucinations.   She had no trouble with

13

immediate recall, and could remember two of three words after a delay.

Dr. Wood opined that Plaintiff had mild limitations in the ability to make judgments on simple work-related decisions, understand and remember complex instructions, and carry out complex instructions. He further stated that Plaintiff had moderate limitations in her ability to make judgments on complex work-related decisions. He noted that Plaintiff would have mild limitations in her ability to interact appropriately with the public, supervisors, and co-workers, and to respond appropriately to usual work situations and changes in a routine work setting. (Tr. 845-55).

As requested by the ALJ, Kimberly Schisler, D.O., performed a consultative orthopedic examination of Plaintiff on January 11, 2010. Dr. Schisler noted that Plaintiff cried or moaned in pain any time she was asked to do a range of motion movement, but that she made some of the same movements moving about the room with no crying or moaning. Plaintiff's gait was within normal limits, and she could heel/toe tandem walk, stand on her toes, and stand on her heels. Dr. Schisler completed a Medical Source Statement questionnaire, opining that Plaintiff could frequently lift and carry up to 20 pounds, sit for 15 minutes at a time for a total of six hours a day, stand for 15 minutes at a time for a total of 20 minutes a day, and walk a quarter of a mile at a time for a total of 30 minutes a day (Tr. 858-68).

**ALJ's Decision of March 18, 2010**  (Tr. 11-21)

The ALJ found that Plaintiff had not engaged in substantial gainful activity since March 29, 2007, her alleged onset date. The ALJ also found that Plaintiff had two severe

14

impairments, affective mood disorder and disorders of the back, but that she did not

suffer from an impairment or combination of impairments that equaled or exceeded one

of the "deemed-disabling" impairments listed in the Commissioner's regulations.

With respect to Plaintiff's mental impairment, the ALJ considered the criteria

under Listing 12.04 for affective disorder and found that Plaintiff had moderate

restrictions or difficulties with respect to activities of daily living, social functioning,

concentration, persistence and pace.  Although Plaintiff had experienced one to two

episodes of decompensation, they were not repeated, did not result in marked limitations

or a residual disease process.  These findings did not meet the criteria for a Listing 12.04

disability.

With respect to Plaintiff's physical impairment the ALJ specifically stated that her

"musculoskeletal impairment does not meet a Listing such as 1.02 or 1.04 because there

was no consistent medical evidence over a 12 month period of gross anatomical

deformity with involvement of major peripheral weight bearing joint with an inability to

ambulate effectively or to perform fine and gross movements effectively on a sustained

basis or consistent medical evidence over a 12 month period or of nerve root

compression."

The ALJ determined that the Plaintiff had the RFC to perform sedentary work[1] as

---

[1]     Sedentary work involves lifting no more than ten pounds at a time,
occasionally lifting or carrying articles like docket files, ledgers, and small tools, and
occasionally walking and standing.  20 C.F.R. § 404.1567(a).

defined in the Commissioner's regulations, but with the following exertional limitations:

she could lift and carry less than ten pounds, stand or walk two hours out of eight hours

and sit six out of eight hours, for a total of eight hours out of eight hours. She could

occasionally climb, balance, stoop, crawl, crouch, or kneel and should never climb

ladders, ropes or scaffold, but should avoid all exposure to moving machinery and

unprotected heights.[2] The ALJ further found that Plaintiff would be limited to performing

simple, repetitive tasks and instructions with only occasional interaction with the public,

supervisors and coworkers.

The ALJ concluded that Plaintiff's subjective statements as to pain and limitations

were not fully supported by the evidence as a whole. In support of his RFC

determination, the ALJ noted that despite the objective evidence indicating that Plaintiff

had some musculoskeletal abnormalities, no doctor who had treated or examined Plaintiff

for these conditions either stated or implied that she was disabled. Referring in particular

to the inconsistencies in the medical record between Plaintiff's subjective reports of her

---

"Occasionally" would generally total no more than about two hours of an eight-hour workday. Sitting would generally total about six hours of an eight-hour workday. Social Security Ruling ("SSR") 96-9p, 1996 WL 374185, at *6-7 (July 2, 1996).

[2] Plaintiff alleged that she had a seizure disorder (Tr. 53). Although the ALJ concluded that presence of such a disorder was not fully substantiated by the medical record, the ALJ's RFC determination took into account Plaintiff's possible seizure disorder, and stated that she should never climb ladders, ropes, or scaffolds and should avoid all exposure to moving machinery and unprotected heights.

symptoms and her behavior when she was not aware she was being observed, the ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effect of her pain and other symptoms were not credible. He further stated that Plaintiff's restrictions in daily activity were her choice and that at least one physician, Dr. Brantl, had advised that she be more active.

In addition, the ALJ noted that Plaintiff's abilities to think, understand, communicate, get along with people, and handle stress had never been documented, on any long term basis, as significantly impaired. He further noted that Plaintiff had a history of refusing or delaying psychiatric care, and that Dr. Wood, the psychiatric consultant who had examined Plaintiff most recently, found that she had mild to moderate limitations. She was mildly limited in her ability to make simple, work-related decisions, and to understand, remember, and carry out complex instructions as well as interact appropriately with the public, supervisors and co-workers; and exhibited moderate limitations in making judgments on complex, work-related decisions.

The ALJ, having determined that Plaintiff was unable to perform any of her past relevant work concluded, on the basis of the VE's testimony, that Plaintiff could perform the requirements of an addresser, a sticker, and a surveillance system monitor, all of which were jobs existing in significant numbers in the national economy.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court "must review

the entire administrative record to 'determine whether the ALJ's findings are supported by substantial evidence on the record as a whole.'" *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011). The court "'may not reverse . . . merely because substantial evidence would support a contrary outcome.' Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion." *Id.* (citations omitted); *see also Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (explaining that the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal by the reviewing court).

To be entitled to benefits, a claimant must demonstrate an inability to engage in substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a severe impairment or combination of impairments. "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) (citing *Page v. Astrue*, 484

F.3d 1040, 1043 (8th Cir. 2007)). A special technique is used to determine the severity

of mental disorders. This technique calls for rating the claimant's degree of limitations in

four areas of functioning: activities of daily living; social functioning; concentration,

persistence, or pace; and episodes of decompensation. § 404.1520a(c)(3).

If the impairment or combination of impairments is severe and meets the duration

requirement, the Commissioner determines at step three whether the claimant's

impairment meets or is equal to one of the deemed-disabling impairments listed in

Commissioner's Regulations. If not, the Commissioner asks at step four whether the

claimant has the RFC to perform her past relevant work. If so, the claimant is not

disabled. If she cannot perform her past relevant work, the burden of proof shifts at step

five to the Commissioner to demonstrate that the claimant retains the RFC to perform

work that is available in the national economy and that is consistent with the claimant's

vocational factors -- age, education, and work experience. *Halverson v. Astrue*, 600 F.3d

922, 929 (8th Cir. 2010).

## Listed Impairments

Plaintiff first argues that her combination of impairments equals one or more of the

deemed-disabling impairments listed in the Commissioner's regulations at 20 C.F.R. Pt.

404, Subpt. P, App. 1 §1.02 or §1.04. Where there is more than one impairment the ALJ

must consider the impairments in combination. 20 C.F.R. § 404.1523; *Anderson v.

Heckler,* 805 F.2d 801, 805 (8th Cir. 1986). However, if the ALJ discusses each of a

plaintiff's impairments and concludes that none render the plaintiff disabled, no further

analysis is required. *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992). "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." *Id.* Here, the ALJ specifically considered both Plaintiff's musculoskeletal impairments and her affective mood disorder, and still decided that she was not disabled. That determination is supported by the record.

With respect to her musculoskeletal impairments, Plaintiff also asserts that the ALJ failed to take her fracture into account in determining whether she met the requirements for the §§ 1.02 and 1.04 listings. However, Plaintiff offers no evidence that her fracture resulted in an inability to ambulate effectively on a sustained basis and there is no consistent medical evidence over a 12 month period to support her assertion that her impairments match a listing or listings and that they meet all specified criteria. In the absence of such evidence, Plaintiff's argument must fail. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (stating that "[f]or a claimant to show that [her] impairment matches a listing, it must meet all of the specified medical criteria."); *Marciniak v. Shalala*, 49 F.3d 1350, 1353 (8th Cir. 1995) (quoting *Zebley*, 493 U.S. at 530).

**The ALJ's Assessment of Plaintiff's RFC**

Plaintiff also argues that the ALJ failed to articulate a sufficient rationale for his RFC determination. A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In *McCoy v. Schweiker*, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful

conditions in which real people work in the real world." *Id.* at 1147. This Court is required to affirm the ALJ's RFC determination if that determination is supported by substantial evidence on the record as a whole. *See McKinney*, 228 F.3d at 862.

The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). The ALJ may discount the claimant's subjective reports of pain and limitation as well as her statements regarding the severity and persistence of such factors. In *Polaski v. Heckler*, 739 F.2d 1320, 1332 (8th Cir. 1984), the Eighth Circuit held that the "absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." The ALJ must also consider "observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the frequency, duration, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." *Id.* "If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to [his] judgment even if every factor is not discussed in depth." *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001). Furthermore, "the ALJ may properly discount the claimant's testimony where it is inconsistent with the record." *Teague*, 638 F. 3d at 615 (citing *Eichelberger v.*

*Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004).

Here, the ALJ fully explained and supported his RFC determination by reference to the medical record, the opinions of treating and examining physicians, and Plaintiff's own testimony regarding her daily activities, as well as her subjective experience of pain and limitation. To the extent that the ALJ found Plaintiff's subjective reports related to her back and leg pain lacking in credibility, he also properly supported this determination. Specifically, he noted the inconsistencies identified by Drs. Brantl and Schisler between their findings on physical examination, Plaintiff's reports of pain, and her actions when she was not aware she was being observed.

With regard to Plaintiff's mental impairments, the ALJ relied extensively on the Plaintiff's testimony, the extensive medical evidence and, in particular, the opinion of Dr. Wood. While Plaintiff had moderate restrictions or difficulties in daily living, social functioning and concentration, the record does not reflect "marked limitations - or "repeated" episodes of decompensation of extended duration. On the basis of this evidence, the ALJ properly found that Plaintiff was limited to performing simple, repetitive tasks and could have only occasional interaction with others. Because the ALJ articulated the inconsistencies upon which he relied in discrediting Plaintiff's testimony regarding her subjective complaints, and because the ALJ's credibility finding is supported by substantial evidence on the record as a whole, the ALJ's finding is entitled to deference. *See Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will

normally defer to the ALJ's credibility determination.").

**Step Five Determination**

Plaintiff finally asserts that having reached step five of the Commissioner's sequential disability evaluation, the ALJ improperly determined that Plaintiff could perform work other than her prior relevant work. The Court does not agree. In making the challenged determination, the ALJ properly relied upon the testimony of the VE. The response of a vocational expert to a hypothetical question that includes all of a claimant's impairments properly accepted as true by the ALJ constitutes substantial evidence to support a conclusion of no disability at step five. *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001).

Here, substantial evidence in the record supports the ALJ's RFC determination, and the ALJ asked a hypothetical question which set forth Plaintiff's limitations in a manner consistent with the ALJ's findings concerning Plaintiff's condition and functional limitations. The VE testified that Plaintiff could perform work as an addresser, sticker, or surveillance system monitor and that such work exists in significant numbers in the national economy. Reliance on a VE's testimony offered in response to a properly formulated hypothetical question is permissible, and such testimony constitutes substantial evidence to support the ALJ's decision that Plaintiff could perform work other than her prior relevant work and was, therefore, not disabled. *Hunt*, 250 F.3d at 625.

## CONCLUSION

In accordance with applicable statutes and regulations, Plaintiff had a fair hearing

and full administrative consideration of her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and Supplemental Security Income under Title XVI of the Act, *id.* §§ 1381-1383f. Substantial evidence on the record as a whole supports the Commissioner's decision regarding her application.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 16th day of February, 2012.